**Affirmed and Memorandum Opinion filed December 21, 2021.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-20-00123-CV

---

**MARCUS JACQUOT, Appellant**

**V.**

**MELODY COKER, Appellee**

---

**On Appeal from the 280th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2019-51429**

---

## M E M O R A N D U M   O P I N I O N

Appellant Marcus Jacquot appeals a lifetime final protective order issued to protect appellee Melody Coker. *See* Tex. Fam. Code Ann. § 81.009(a). Jacquot contends that the evidence is legally and factually insufficient to support the order in several respects; that the trial court erred by excluding Jacquot and his wife from testifying; that the protective order is an improper collateral attack on a prior modification order in a suit affecting the parent-child relationship ("SAPCR"); and that the trial court demonstrated bias against him.

After a thorough record review, we conclude that sufficient evidence supports the protective order and that Jacquot's remaining issues either are not preserved or lack merit. Accordingly, we overrule his issues and affirm the protective order.

## Background

Coker and Jacquot are the biological parents of G.S.C., who we refer to by the pseudonym Grayson. In July 2019, Coker filed a pro se application for a protective order, seeking protection for herself and, as relevant here, Grayson, who at the time of these proceedings was seven years old.

At the hearing on the protective order application, Coker testified that Jacquot pushed her on some stairs while she was holding Grayson and she nearly fell. She also related another occasion when Jacquot pushed her and left bruises on her legs when she was exchanging Grayson with him. Coker stated that she was concerned that Jacquot would be physically abusive to her in the future.

Coker also described instances of Jacquot's abusive behavior, sexual in nature, directed at Grayson. Coker testified that Grayson "has made it clear on many occasions that his father [Jacquot] has sexually abused him." The first instance occurred when Grayson was three or four years old in 2014; he told Coker that "daddy touched my booty." When Coker asked Jacquot about Grayson's claim, Jacquot threatened her. After Grayson's outcry, Coker took him to a pediatrician who did a "head to toe exam" and contacted child protective services ("CPS"). However, after an investigation, CPS "ruled out" this allegation of sexual abuse.[1] Coker explained nonetheless that Grayson is "very withdrawn," suffers from

---

[1] After investigating a child abuse or neglect allegation, CPS will assign one of five possible dispositions: (1) reason to believe (based on a preponderance of the evidence); (2) ruled out; (3) unable to complete; (4) unable to determine; or (5) administrative closure. *In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *2 n.5 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (referencing 40 Tex. Admin. Code § 700.511(b)).

2

nightmares and fear both at home and at school, and does not want to participate in normal activities. Grayson has attended several therapy sessions with different therapists while in Coker's care.

Coker described several other events indicating that Jacquot may have sexually abused or otherwise mistreated Grayson. In 2015, when Grayson was in preschool, he tried to put straws in his nose to "be like daddy." The preschool reported the incident to CPS, but after an investigation, any abuse allegation was ruled out. Then, in 2017, Grayson "tried to perform oral sex on his little brother" in front of Coker. Coker took Grayson to a therapist, but he did not make any outcry to this therapist. It is unclear whether this incident resulted in a CPS referral. Shortly thereafter, Grayson was "caught humping another child, a boy" at his daycare, and the school reported the incident to CPS. However, after an investigation, CPS ruled out the allegation. According to Coker, Grayson made another outcry at his daycare in 2018, which was reported to CPS. CPS disposed of this allegation as "unable to determine," which means that the allegation could not be proven either true or false. Finally, in 2019, Grayson told teachers at both his weekday and weekend daycares that Jacquot "was putting his finger in his butt and making him do things." CPS investigated these allegations and again was unable to determine their truth or falsity. According to Coker, Grayson told her that Jacquot threatened to kill him if he told anyone. Coker encouraged Grayson to "speak the truth" and that he "shouldn't fear" expressing his feelings or telling others what occurred. Coker was aware that there had been questions about whether she was "coaching" Grayson, but she testified she never instructed him to say anything. Coker believes that Jacquot has sexually abused Grayson in the past and will do so again in the future.

One of Grayson's daycare workers, Bolanle Akinseye, testified that in July or August of 2019, Grayson told her that Jacquot "beat" him because he broke some

toys. He also told Akinseye that "his dad puts his hands on his private part." She reported this outcry to CPS. Akinseye described Grayson as a "quiet guy" who is "very intelligent." Terrill Talton, an associate pastor at Coker's church, testified that Coker came to him in February 2018 with concerns about Grayson, seeking prayers for his safety. Later that day, Coker called Talton because Grayson wanted to speak to him. During that telephone conversation, Grayson told Talton, "[M]y daddy is touching me." Grayson told Talton that Jacquot was touching his "pee-pee." Grayson also told Talton that he feared Jacquot. Talton reported this incident to CPS. Talton, who was in the process of completing his certification to be a family counselor, met with Grayson four or five times after this telephone conversation. During these meetings, Grayson told Talton that his "daddy wants to stick his finger in my booty." Grayson drew some pictures of what he believed had occurred; Talton described these pictures as "graphic, showing penetration; and then showing him wanting to kill his father." Talton testified that Grayson was afraid that Jacquot was going to hurt him, his mother, or his brother. According to Talton, when he spoke to CPS to relay these details, the caseworker told him that the case was already being investigated and "they found the father not guilty of any charges." Talton said CPS's caseworker never asked for the pictures Grayson had drawn or for any other details from Talton's sessions with Grayson

One of Grayson's weekend daycare teachers, Olivia Wilson, testified that in July 2019 Grayson told her that he did not want to stay with Jacquot anymore because Jacquot "hurt me really bad." Grayson told her in September 2019 that Jacquot "put his finger in my butt." She documented these incidents and turned them in to her supervisor, but she was not sure whether a CPS referral was made. Chuck Wall, the owner and director of this daycare center, testified that, after speaking with Coker, he did not believe Grayson's allegations and felt that Coker might be

4

attempting to "gain an advantage." Nonetheless, once Grayson made these outcries, Wall reported the allegations to CPS.

CPS investigator Marissa Marks testified that, in July 2019, a referral was made regarding Grayson's alleged sexual abuse. She stated that she reviewed CPS's paperwork relating to Grayson and discovered that there had been "eight plus" referrals. She was not familiar with the details of the previous referrals. As part of her investigation, Marks spoke to Grayson about the allegations, and he told her that Jacquot put his finger in Grayson's "butt," although Grayson could not specify a date when it occurred. After speaking with Grayson and Coker, a forensic interview was conducted with Grayson, during which he again stated that "his father put his finger in his butt." Marks completed her investigation by speaking with Jacquot and others who could "vouch for [his] parenting ability." She also engaged "monitors" at Grayson's school to observe his behavior. She did not speak with Grayson's doctors, therapists, or pastors. After Marks completed her investigation, CPS designated this abuse allegation as "unable to determine."

According to CPS investigator Sharise Washington, CPS received about seven different referrals regarding alleged sexual abuse of Grayson during her time as an investigator. Washington investigated several of these allegations and ruled out the alleged abuse, though Coker disagreed with her findings. As part of her investigations, Washington spoke to Grayson, Jacquot (who she said "seemed honest"), and Coker (who was "very concerned" for Grayson). Washington testified that she conducted a thorough investigation, that she was not made aware of Talton or any of Grayson's drawings, and that everyone involved in the investigation had her phone number and could contact her at any time for any reason about the case. Washington explained that none of her investigations resulted in "a sustained finding

5

of sexual abuse." However, Washington was not the caseworker/investigator on all the CPS referrals made concerning Grayson.

During the hearing, Coker also testified about an earlier SAPCR proceeding and that the judge presiding over that proceeding determined that Coker's abuse allegations were not credible. Before August 2018, Coker was Grayson's primary conservator. But new orders signed in August 2018 in the SAPCR proceeding named Jacquot Grayson's primary conservator, and Coker had access and possession of Grayson pursuant to a standard possession order. Although Coker alleged in the SAPCR proceeding that Jacquot had abused Grayson, the trial court there found that allegation not true.[2]

After hearing this evidence, the trial court took Coker's application for a protective order under advisement. The trial judge also conducted an in camera interview with Grayson.

On November 18, 2019, the trial court signed a final protective order granting the application.[3] In the order, the trial court found: (1) "that family violence has occurred and is likely to occur in the future"; and (2) that "under Texas Penal Code § 22.021, [Jacquot] has engaged in conduct that is a felony offense, if charged, and therefore, the Protective Order is granted for a period of longer than two years." The trial court granted a protective order to Grayson for Jacquot's lifetime and suspended Jacquot's periods of possession and access to Grayson that were established in the

---

[2] The order in the SAPCR states, "The Court further finds that pursuant to Texas Family Code, Section 153.013, credible evidence was set forth that Petitioner/Counter[-]respondent MELODY COKER made a report alleging child abuse by another party that MELODY COKER knew lacked a factual foundation."

[3] The order also lists as a protected person Coker's other son, C.L.C., who is not related to Jacquot.

SAPCR modification order.  Pursuant to the protective order, Coker was granted exclusive possession of Grayson.  The protective order also prohibits Jacquot from:

- committing family violence [or] any actions that could cause physical or emotional harm to another;
- doing any act that is intended to result in physical harm, bodily injury, assault, or sexual assault against any protected person;
- doing any act that is a threat that reasonably places any protected person in fear of imminent physical harm, bodily injury, assault, or sexual assault;
- committing abuse of a child of the family or household;
- communicating directly with any protected person in a threatening or harassing manner;
- communicating a threat through any person to any protected person;
- communicating in any manner with any protected person except through Jacquot's attorney (on the basis of good cause shown);
- engaging in conduct specifically directed toward any protected person that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the protected person;
- going to or near, or within 500 feet, of any location where any protected person is known by Jacquot to be and further prohibited from remaining within 500 feet after Jacquot becomes aware of the protected person's presence;
- going to or near the residences or places of employment or business of any protected person and must maintain at least 500 feet from any place in which Grayson resides;
- going to the residences, child-care facilities, or schools that Grayson normally attends;
- removing Grayson from Coker's possession; and
- possessing a firearm or ammunition.

Jacquot, appearing pro se after his trial counsel withdrew, filed a motion for new trial.  In this motion, he identified the following factual bases for a new trial: (1) his due process rights were infringed because he was denied the right to testify;

7

(2) the trial court denied his motion to vacate based on the "overlapping issues" in the SAPCR modification; (3) the trial court denied his motion to transfer to the court in which the SAPCR proceedings were ongoing; and (4) he did not get a fair trial because the trial court displayed bias in opposing counsel's favor.  In the affidavit attached to the motion, Jacquot averred:

> The 280th District Court erred in not allowing Marcus Jacquot to testify during trial on October 28, 2019 which was entered on November 18, 2019.  My right to due process was violated (Tex. Art. 1 § 19).  The opposing counsel lied and mislead [sic] the court causing this exclusion of testimony by telling the court I (Marcus Jacquot) spoke of the proceeding at lunch time when I in fact was talking to my attorney on record during the hearing over the phone.  The judge didn't question the opposing counsel (R. Nicole Stagg) claim by stating that the 2 of them are friends of more than 20 years.  The presiding judge also stated I should mandamus her.  I was not given a fair and impartial trial and the court also abused its discretion.  The testimony provided by petitioner had previously been declared as falsified testimony by the 245th court in August of 2018 but the 280th court ignored this evidence.  The judge interviewed my 7 year old son disregarding the fact that he has previously been coerced by his mother Melody Coker to state the allegations.  Important evidence such as my testimony, proof of doctor visits the child was taken to by the father (4 times) because of the mother continuing to use the subject matter of child abuse/sex abuse as leverage and to find a venue.[4]

The trial court denied Jacquot's motion for new trial on January 29, 2020.  Jacquot filed an affidavit of inability to pay costs, which was not contested.  This appeal timely followed.

## Analysis

We begin our analysis by noting that, in this court, Jacquot is self-represented.  Although he proceeds pro se on appeal, Jacquot is held to the same standards as a

---

[4] Spelling and capitalization normalized.

licensed attorney and must comply with all applicable rules of procedure. *See Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 930 (Tex. App.—Houston [14th Dist.] 2008, no pet.). If this were not so, pro se litigants would benefit from an unfair advantage over those parties represented by counsel. *Id.* Thus, we do not apply different standards simply because a case is presented by a pro se litigant. *Id.*

## A. The Protective Order Application

In his first issue, Jacquot contends that the protective order application is defective. Specifically, he argues that because no application for protection was filed separately for Grayson, the "charges for sexual assault of child w[ere] not properly before the Court."

A court shall render a protective order if the court finds that family violence has occurred and is likely to occur in the future. Tex. Fam. Code § 81.001. "Family violence" includes "an act by a member of a family . . . against another member of the family . . . that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself." *Id.* § 71.004(1). "Family" includes "individuals related by consanguinity" or "individuals who are the parents of the same child, without regard to marriage." *Id.* § 71.003.

Regarding family violence under Family Code section 71.004(1), "an adult member of the family or household may file an application for a protective order to protect the applicant or any other member of the applicant's family or household." *Id.* § 82.002(a). An application for a protective order under the Family Code must state:

> (1) the name and county of residence of each applicant; (2) the name and county of residence of each individual alleged to have committed

9

family violence; (3) the relationship between the applicants and the individual alleged to have committed family violence; (4) a request for one or more protective orders; and (5) whether an applicant is receiving services from the Title IV-D agency in connection with a child support case and, if known, the agency case number for each open case.

*Id.* § 82.004.

Coker's application included the name and county of residence for herself and her two children. She also provided Jacquot's address and county of residence. She identified her two sons as children under age 18 for whom she sought protection, and she indicated that Jacquot is Grayson's biological father. Coker acknowledged that there were other court cases involving custody and indicated that there was a "compliance setting" in August 2019. Accordingly, Coker included in her application the information required by section 82.004.[5]

Jacquot contends that, when seeking a protective order for sexual assault on behalf of a child, an application for protection must be filed in the child's name, citing *In re Salgado*, 53 S.W.3d 752, 762 (Tex. App.—El Paso 2001, orig. proceeding). In *Salgado*, the court explained that the adult seeking a protective order for a child "incorrectly" labeled herself as the applicant: "While the application may be filed by an adult on behalf of a child, the protective order is issued to protect 'the applicant,' who in this case is the child alleged to be the victim of family violence." *Id.* The court did not, however, suggest that this error invalidated the protective

---

[5] Jacquot complains that Coker failed to check certain options provided on the protective order application form, such as that she and Jacquot are parents of a child or that she is an adult seeking protection of a child. A party may file special exceptions to challenge allegedly defective pleadings. *See* Tex. R. Civ. P. 91; *Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021) ("The proper response to a legally or factually infirm pleading is to file special exceptions to the pleading."). Jacquot did not challenge the alleged defects by special exception and thus has waived any complaints about them. *E.g.*, *Davis v. Angleton Indep. Sch. Dist.*, 582 S.W.3d 474, 481 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). In any event, Grayson's parentage is indicated elsewhere in the application, even though it is not required to be stated. *See* Tex. Fam. Code § 82.004.

order itself; in fact, the court denied the adverse party's request for mandamus relief. *See id.* at 764-65. And at any rate, unlike here, the adult in *Salgado* was seeking protection only for the child, not for herself as well as the child. *Id.* at 755-56.

Because Coker's protective order application fulfills the requirements of Family Code section 82.004, Jacquot's first issue lacks merit, and we overrule it.

## B.      Evidence of Family Violence

In his second issue, Jacquot contends the evidence is legally and factually insufficient to support the trial court's finding that family violence has occurred and is likely to occur in the future.

When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 807, 827; *Hancock v. Worbington*, No. 14-15-00964-CV, 2017 WL 1181308, at *2 (Tex. App.—Houston [14th Dist.] Mar. 30, 2017, no pet.) (mem. op.). If there is more than a scintilla of evidence to support the judgment, it must be upheld. *Hancock*, 2017 WL 1181308, at *2 (citing *Coffman v. Melton*, 448 S.W.3d 68, 71 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). More than a scintilla of evidence exists when the evidence supporting the finding rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

To review a factual-sufficiency challenge, we examine the entire record, considering all the evidence both in favor of and contrary to the challenged findings. *Id.* (citing *St. Germain v. St. Germain*, No. 14-14-00341-CV, 2015 WL 4930588, at *3 (Tex. App.—Houston [14th Dist.] Aug. 18, 2015, no pet.) (mem. op.)). We will

11

overturn a finding only when it is so contrary to the overwhelming weight of the evidence so as to be clearly wrong and unjust. *Id.* The fact finder is the sole judge of the weight and credibility of the witnesses' testimony; we may not substitute our judgment for that of the trial court simply because we might reach a different conclusion. *Id.* (citing *Coffman*, 448 S.W.3d at 71).

The trial court found that Jacquot has engaged in conduct that is a felony offense, if charged, citing Texas Penal Code section 22.021.[6] This provision provides that a person commits aggravated sexual assault if the person intentionally or knowingly causes the penetration of the anus of a child under 14 years of age by any means. Tex. Penal Code § 22.021(a)(1)(B)(i), (2)(B).

Coker testified that Grayson told her on several occasions that Jacquot sexually abused him. Coker also identified instances where Grayson acted out sexually. Coker testified that Grayson told her that Jacquot had threatened to kill Grayson and the rest of the family. In addition, Grayson's daycare providers testified Grayson made several outcries that Jacquot sexually abused him by putting his finger in Grayson's anus. *See id.* Talton testified that he met with Grayson on several occasions and that Grayson told Talton that Jacquot hurt him, that Jacquot touched his butt and his "pee pee," and that he was scared that Jacquot would hurt him, his mother, or brother. Talton also described "graphic" pictures that Grayson drew

---

[6] As part of this issue, Jacquot complains that the trial court did not include in the order the finding described by Family Code section 85.025(a-1). This section provides among other things that a trial court may render a protective order for a period exceeding two years if the court finds that the person who is the subject of the protective order "committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense . . . ." Tex. Fam. Code § 85.025(a-1)(1). "If the court renders a protective order for a period of more than two years, the court must include in the order a finding described by Section 85.025(a-1). *Id.* § 85.001(d). The trial court made the requisite finding because the order states that "under Texas Penal Code § 22.021, [Jacquot] has engaged in conduct that is a felony offense, if charged . . . ."

depicting Jacquot "penetrating" Grayson. CPS investigator Marks testified that Grayson made an outcry of sexual abuse during a forensic interview.

Jacquot challenges the above evidence as insufficient because no charges were ever filed against him and because most of the CPS investigators "ruled out" the abuse allegations. However, the sworn testimony of an applicant alone may be sufficient evidence for a court to grant a protective order. *See Amir-Sharif v. Hawkins*, 246 S.W.3d 267, 272 (Tex. App.—Dallas 2007, pet. dism'd w.o.j.) (rejecting argument that evidence was insufficient to grant protective order absent corroborating police records, photographs, testimony, or medical records); *cf. St. Germain*, 2015 WL 4930588, at *4 (trial court entitled to credit applicant's testimony over testimony of other witness).

Moreover, Coker's testimony is not the only evidence a reasonable fact finder could have accepted. Several witnesses testified that Grayson outcried that Jacquot penetrated Grayson's anus with his finger. And, importantly, the trial court conducted an in camera interview with Grayson.

The trial court, as fact finder and the sole judge of witness credibility, reasonably could have believed that Jacquot committed aggravated sexual assault of Grayson, a child. Thus, viewing the evidence in the light most favorable to the judgment, we conclude that more than a scintilla of evidence exists to support the trial court's findings that family violence occurred and is likely to occur again in the future. *E.g.*, *Hancock*, 2017 WL 1181308, at *3; *St. Germain*, 2015 WL 4930588, at *3-4; *Coffman*, 448 S.W.3d at 74. Based on all the evidence before the trial court, its findings are not so contrary to the overwhelming weight of the evidence so as to be clearly wrong and unjust. *Hancock*, 2017 WL 1181308, at *4; *St. Germain*, 2015 WL 4930588, at *3-4; *Coffman*, 448 S.W.3d at 75. Accordingly, the evidence is

13

both legally and factually sufficient to support the trial court's findings that family violence occurred and is likely to occur again in the future.

We overrule Jacquot's second issue.

## C. Exclusion of Jacquot's Testimony

Jacquot presents his third issue as follows: "Whether the District Court erred when excluding Appellant, the defendant, on the basis of Texas Rule of Evidence 614 exception, violates U.S. Const. Amends. V, VI, XIV; Tex. Const. art. 1 § 19." Although this issue does not make his complaint clear, Jacquot conflates exclusion from the courtroom with exclusion of his testimony. The trial court did not exclude Jacquot from the courtroom under the Rule. Rather, after the court was alerted to a rule 614 violation, it excluded Jacquot from testifying. We review exclusionary rulings for abuse of discretion. *E.g.*, *Harpst v. Fleming*, 566 S.W.3d 898, 905 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("We review a trial court's decision to admit or exclude a witness from testifying for an abuse of discretion.). We also review a trial court's actions in enforcing the Rule for an abuse of discretion. *Drilex Sys., Inc. v. Flores*, 1 S.W.3d 112, 117-18 (Tex. 1999) (op. on reh'g).

In Texas, sequestration of witnesses is governed by Texas Rule of Evidence 614 and Texas Rule of Civil Procedure 267. *Id.* at 117. These rules (collectively, the "Rule") provide that, at the request of any party, the witnesses on both sides shall be removed from the courtroom to some place where they cannot hear the testimony delivered by any other witness in the cause. Tex. R. Civ. P. 267(a); Tex. R. Evid. 614. In this case, at the beginning of the protective order hearing, Coker's counsel invoked the Rule. *See* Tex. R. Civ. P. 267(a); Tex. R. Evid. 614. The prospective witnesses were sworn, admonished,[7] and dismissed from the courtroom. Jacquot

---

[7] The trial court admonished the witnesses:

14

remained in the courtroom. *See* Tex. R. Civ. P. 267(b) (exempting certain classes of prospective witnesses from exclusion from the courtroom, including, as is relevant here, a party who is a natural person or his or her spouse); Tex. R. Evid. 614(a) (same).

During a lunchbreak, Olivia Wilson, one of the witnesses who had previously testified, overheard Jacquot speaking about the case in the presence of several other prospective witnesses. Coker's counsel learned of this conversation from Wilson and informed the trial court about the incident after the lunch break. Coker's counsel asked that Jacquot and the witnesses who heard his conversation be excluded from testifying. The trial court questioned Wilson, who testified that she saw Jacquot with several other witnesses and heard him "saying things pertaining to what's going on here."

For his part, Jacquot told the court that he was speaking on the phone to his attorney:

> THE COURT: Okay. You were talking on the phone with other witnesses around where they could hear what you were saying; is that right, sir?

---

Folks, for those of you who I have just sworn in to testify as witnesses, there is a special rule that's been invoked. And until it is your turn to come up here and sit in the witness chair and testify, you need to wait outside in the hallway. And you cannot talk to anyone about this case, except for the lawyers in this case. You cannot talk amongst yourselves. You cannot have anybody else come out in the hallway and talk to you. Nobody should be texting you. Nobody should be calling you on the phone. Nobody should be dropping hints to you. And if that happens, then you need to, one, ignore them; and, two, let my bailiffs know when you come into the courtroom because it's against the rules to do so.

*If I find out that you guys are discussing the matter amongst yourselves, then I cannot let you testify.* And I can also impose monetary sanctions, which I don't want to do, and I know you don't want me to do. So, I'm going to ask that you sit outside in the hallway until it's your turn.

(Emphasis added).

15

THE RESPONDENT:  I was talking to my counsel.

THE COURT:  . . . . The witnesses that were sitting at the table are not going to be allowed to testify and, sir, neither are you.  You have disobeyed this Court's direct order; and, therefore -- and I made it very clear that if you violated this Court's order, then you would not be allowed to testify and that there could be other sanctions imposed, as well.

***

THE COURT:  Mr. Jacquot, did you hear my admonishments this morning when I swore, everybody in including yourself?  Did you hear my admonishments?  I want you to answer my questions, not the question that you want to answer.  Did you hear my admonishment?

THE RESPONDENT:  Yes.

THE COURT: And did you hear me say that you were not allowed to talk about anything; not to text, call, hint, nothing that you can talk about.  Anything else you wanted.  Do you remember me saying that?

THE RESPONDENT:  I did hear that.

THE COURT:  And you went out in the hallway, is it correct, and you began to have a conversation with those folks out there about what had transpired in here?

THE RESPONDENT:  Not exactly.  I wasn't --

THE COURT:  Not exactly.  Did you talk about anything that had happened in this courtroom?

Anything?  Anything?

THE RESPONDENT:  Yes.

THE COURT:  Okay.  Well, we're going to have a show cause, not today; but you're now going to have to come back and -- several of you are, and show this Court why you should not be held in contempt of court.[8]

---

[8] The trial court later declined to hold Jacquot in contempt.

16

During a subsequent hearing, Jacquot's counsel confirmed that the phone conversation in question was between her and Jacquot.[9]

The trial court granted Coker's request to exclude the testimony of Jacquot and two other witnesses who were present when he was talking about the case.

Jacquot contends that the trial court's ruling was error because he was exempt from the Rule. Specifically, he contends that because he was exempt from the Rule, he "was free to discuss the case with his attorney, and his doing so did not violate[] the Rule." It is true that Jacquot may speak with his attorney about the case and that doing so does not violate the Rule. However, his conversation occurred in front of other potential witnesses, and he also spoke with the witnesses about matters pertaining to the case after being placed under the Rule.

---

[9] [JACQUOT'S COUNSEL]: As you know that I had attorney Mike Driver in my staff because I was out, I was actually hospitalized a week before our hearing. And this was specifically for the respondent Marcus Jacquot that his testimony was excluded and he was hit with this contempt that you have graciously passed. But Mr. Jacquot was on the phone with me during that time and as his lawyer, I believe that he is able to speak with his lawyer without being in violation of the Rule and I just want to make sure that -- or whatever that he was being charged with to be held under contempt, that that's what it was. I know that you deal with so many cases and you probably don't remember that.

THE COURT: Well I remember this case. The problem with that, counsel, is the fact that he was sitting at the table with other witnesses that had not yet testified. And when you're sitting at a table with one -- other witnesses and you're going over whatever it is with the attorney, those witnesses can hear that and that's just the same as if you were standing in the hallway going over that testimony where other witnesses are. So that was the issue with your client.

[JACQUOT'S COUNSEL]: Okay.

THE COURT: He was sitting at the table and the other witnesses were listening to that testimony, or whatever it is you all were talking about. I wasn't there, so I don't know what. But I would assume that it would be -- you were discussing what had happened during the morning session or going over what he was going to testify to or something of that nature, okay?

[JACQUOT'S COUNSEL]: Okay.

17

We reject Jacquot's issue for two reasons: (1) his appellate complaint is not preserved; and (2) he has not shown that the trial court abused its discretion in excluding his testimony as a consequence for his violation of the Rule.

To preserve a complaint for appellate review, the record must first show that the complaint was made to the trial court by a timely request, objection, or motion. *See* Tex. R. App. P. 33.1(a). And when a party complains about the exclusion of evidence, he must inform the court of the evidence's substance by an offer of proof. *See* Tex. R. Evid. 103(a)(2). Jacquot did not object to the trial court's decision to exclude his testimony, nor did he make an offer of proof concerning the substance of his testimony. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(2); *Bosch v. Cedar Vill. Townhomes Homeowners Ass'n, Inc.*, No. 01-09-00654-CV, 2011 WL 346317, at *6 (Tex. App.—Houston [1st Dist.] Feb. 3, 2011, no. pet.) (mem. op.) ("When a trial court improperly excludes evidence, a party must show that . . . the substance of the error was made known to the court by offer or was apparent from the context in which questions were asked. A party must present the nature of the evidence with enough specificity that an appellate court can determine its admissibility and whether any exclusion was harmful." (citations omitted)); *In re N.R.C.*, 94 S.W.3d 799, 806 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); *see also In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) ("[r]equiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds"). Thus, Jacquot failed to preserve his third issue in the trial court.

Second, Jacquot has not demonstrated an abuse of discretion. Although Jacquot is exempt from being excluded from the courtroom under the Rule, the trial court did not exclude him from the courtroom. Rather, the court excluded him from testifying as a consequence of his Rule violation by discussing the case in the

presence of other potential, sworn witnesses during a break. Jacquot, like any witness, is required to comply with the Rule once invoked. *See* Tex. R. Civ. P. 267(d); Tex. R. Evid. 614. And when, as here, the Rule is violated, the trial court may exclude the testimony of the witness who commits the violation. *See Drilex Sys.*, 1 S.W.3d at 117-18; *In re D.T.C.*, 30 S.W.3d 43, 49-50 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Jacquot acknowledged in his brief that a trial court properly excludes a witness's testimony in this circumstance: "When a witness violates the Rule, the trial court should exclude the witness from testifying. *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996)."

The trial court admonished the witnesses, including Jacquot, regarding the Rule's requirements and the consequences for its violation. Jacquot did not follow the court's instructions, and the court imposed permissible consequences. Under these facts, we do not perceive an abuse of discretion. *Cf. D.T.C.*, 30 S.W.3d at 49-50 (no abuse of discretion when trial court excluded testimony of three witnesses for violating the Rule).

We overrule Jacquot's third issue.

## D. Exclusion of Jacquot's Wife from the Courtroom

In his fourth issue, Jacquot contends the trial court violated his constitutional due process right by excluding his wife, Dolores, from the courtroom and placing her under the Rule.[10] In civil cases, a party's spouse is exempt from the Rule. *See* Tex. R. Civ. P. 267(b).

Again, to preserve a complaint for appellate review, the record must show that the complaint was made in the trial court. *See* Tex. R. App. P. 33.1(a). Jacquot did

---

[10] The testimony conflicts regarding whether Dolores is Jacquot's spouse or girlfriend. We express no opinion on that issue and presume Dolores to be Jacquot's spouse.

19

not raise this complaint in the trial court. For example, once the witnesses including Dolores were sworn and instructed under the Rule, Jacquot did not notify the trial court that he was married or that one of the witnesses excluded from the courtroom was in fact his spouse and therefore should remain present. Dolores left the courtroom without any objection. Thus, Jacquot failed to preserve this complaint for our review. *See* Tex. R. App. P. 33.1(a); *B.L.D.*, 113 S.W.3d at 350.

We overrule Jacquot's fourth issue.

## E.    Res Judicata

In his fifth issue, Jacquot contends that the protective order is an attack or re-litigation of the SAPCR modification judgment, which is prohibited under the doctrine of res judicata or claim preclusion.

Jacquot's arguments under this issue are unavailing. For res judicata to apply, the defendant must prove:  (1) a final prior judgment on the merits by a court of competent jurisdiction; (2) the identity of the parties, or those in privity with them; and (3) a second action based on the same claims as were or could have been raised in the first action. *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010); *Welch v. Hrabar*, 110 S.W.3d 601, 606 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Res judicata is an affirmative defense that must be pleaded or it is waived. *E.g.*, *Pruneda v. Granados*, No. 01-20-00043-CV, 2021 WL 2231267, at *12 (Tex. App.—Houston [1st Dist.] June 3, 2021, no pet.) (mem. op.). Because Jacquot did not raise the defense of res judicata in the trial court, he may not raise it for the first time on appeal. *Id.* (when respondent did not raise affirmative defense of res judicata in protective order proceedings, he could not raise it for the first time on appeal); *see also Lewis v. Yancy*, No. 01-19-00348-CV, 2020 WL 7251448, at *8 (Tex. App.—Houston [1st Dist.] Dec. 10, 2020, no pet.) (mem. op.) (same).

We overrule Jacquot's fifth issue.

## F.     Allegation of Judicial Bias

In his sixth and final issue, Jacquot contends that the trial court "expressed judicial bias when it prevented [him] from testifying and consistently interrupted and undermined [his] counsel such that he could not fully present his case."

"All parties have a right to a fair trial before an impartial judge." *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.).  A neutral and detached judge is fundamental to a fair trial.  *Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g).  Judges should not be an advocate for or an adversary of any party.  *Id.*  But only in the rarest of circumstances will judicial rulings show favoritism or antagonism to the degree necessary to conclude that the trial was not fair or that the judge was not impartial. *Ellason*, 162 S.W.3d at 887; *see also Haynes v. Union Pac. R.R. Co.*, 598 S.W.3d 335, 352-53 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd).  Remarks made by the judge "during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001). Instead, reversible bias or partiality is shown if the judge's conduct showed "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

As with many other alleged errors, to preserve a judicial bias complaint, a party generally must object to the trial court's alleged improper conduct or comment when it occurs. *See id.* at 241; *Markowitz*, 118 S.W.3d at 88.  But "[i]n the context of a bench trial, if the error is incurable, courts excuse a party's failure to object." *Song v. Kang*, No. 02-18-00375-CV, 2020 WL 1808487, at *8 (Tex. App.—Fort Worth Apr. 9, 2020, pet. denied) (mem. op.).

Here, in support of his judicial bias issue, Jacquot identifies the following occasion when the trial court sustained an objection during his counsel's attempt to elicit testimony from CPS investigator Washington:

[JACQUOT'S COUNSEL]: What was your impression of Ms. Coker's demeanor during the course of this investigation?

[WASHINGTON]: Ms. Coker, she appeared protective. She appeared very concerned for her child. And just as if any other parent that's concerned.

[JACQUOT'S COUNSEL]: Did she -- did she exhibit any warning signs to you, anything to cause alarm about her behavior?

[WASHINGTON]: Not specifically with me; however, my supervisor --

[COKER'S COUNSEL]: I'm going to object to anything that did not happen -- that happened that she did not have firsthand knowledge on.

THE COURT: Sustained.

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tex. R. Evid. 602. Because Washington acknowledged that she did not personally observe any "warning signs," the trial court properly sustained Coker's objection to this testimony. The trial court surely did not exhibit judicial bias by sustaining a proper objection. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) (explaining that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion"); *cf. In re L.S.*, No. 02-17-00132-CV, 2017 WL 4172584, at *16-17 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.) (mem. op.) (concluding that trial judge demonstrated judicial bias where it "badgered" agency into seeking termination because "the judge, who was sitting as the fact-finder, had already determined that Father was noncompliant and would never be compliant"); *id.* at *19 (trial judge's

22

extensive questioning of Father showed judge had "ceased to be an impartial fact-finder or umpire and was acting as an advocate in favor of termination").

The only other ruling Jacquot identifies as supporting his claim of judicial bias is the trial court's exclusion of his and his wife's testimony. As discussed above, however, the trial court permissibly excluded Jacquot's testimony because he violated the Rule. *E.g.*, *Drilex Sys.*, 1 S.W.3d at 117; *D.T.C.*, 30 S.W.3d at 49-50. Additionally, the court excluded Dolores from testifying because she was one of the prospective witnesses present when Jacquot discussed the case. As explained, Jacquot did not notify the trial court that she was his wife or request that she be exempted from the Rule. We conclude that Jacquot has not shown this case to be one of the rare circumstances where judicial rulings show favoritism or antagonism to the degree necessary to conclude that the trial was not fair or that the trial judge was not impartial. *Cf. D.T.C.*, 30 S.W.3d at 49-50. For these reasons, we overrule his sixth and final issue.

## Conclusion

Having overruled Jacquot's issues, we affirm the protective order.

/s/     Kevin Jewell
        Justice

Panel consists of Justices Jewell, Spain, and Wilson.